IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **KIMBERLEE K. HINES,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Civil No. 11-1024-CJP** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Kimberlee K. Hines is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits (DIB).[1]

### Procedural History

Plaintiff filed an application for DIB in March, 2010, alleging disability beginning on November 13, 2009. The application was denied initially and on reconsideration. After holding two evidentiary hearings, Administrative Law Judge (ALJ) Stephen M. Hanekamp denied the application for benefits in a decision dated April 7, 2011. (Tr. 12-23). Plaintiff's request for review was denied by the Appeals Council, and the April 7, 2011, decision became the final agency decision. (Tr. 1-6).

Plaintiff has exhausted her administrative remedies and has filed a timely complaint in this court.

### Issue Raised by Plaintiff

Plaintiff contends that the ALJ erred in discounting the opinion of her treating

---

[1]This case was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c). See, Doc. 25.

neurologist, Dr. Syed Ali.

## Applicable Legal Standards

To qualify for DIB a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. It must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. ***Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992); see also, 20 C.F.R. §§ 404.1520(b-f).**

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. The scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not

whether Ms. Hines was, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  **See,** ***Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing ***Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)**).  This Court uses the Supreme Court's definition of substantial evidence, i.e, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  ***Richardson v. Perales*, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**.  However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

### The Decision of the ALJ

ALJ Hanekamp followed the five-step analytical framework described above.  He determined that Ms. Hines had not been engaged in substantial gainful activity since the alleged onset date.  She was insured for DIB through December 31, 2013.  The ALJ found that plaintiff had severe impairments of scoliosis, degenerative disc disease, post-traumatic syndrome with peripheral neuropathy, carpal tunnel syndrome, asthma and allegations of memory difficulties.  He found that her alleged depression was not a severe impairment.  A lumbar MRI incidentally showed a small tumor in her lung, which was found to be cancer.  This was successfully treated with surgery, and she did not require chemotherapy or radiation.

The ALJ further determined that plaintiff's impairments do not meet or equal a listed impairment.  The ALJ found that Ms. Hines had the residual functional capacity to perform a limited range of work at the light exertional level.  A vocational expert testified that she could

perform jobs which exist in significant numbers in the national and local economy. The ALJ accepted this testimony, and found that she is not disabled. (Tr. 12-23).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the point raised by plaintiff.

**1.   Agency Forms**

Plaintiff was born in December, 1960, and was almost 49 years old on the alleged onset date. (Tr. 204). She was 5'10" and weighed 130 pounds. She alleged head and spine injuries from a car accident. (Tr. 209).

Plaintiff said that she stopped working in February, 2008, because the company that she worked for closed. (Tr. 210). She became disabled on November 13, 2009. (Tr. 210).

Ms. Hines graduated from high school. (Tr. 210). She had worked as a hostess in a hotel, an executive assistant and a self-employed wedding entertainer. (Tr. 211).

**2.   Evidentiary Hearings**

The initial hearing was held on March 1, 2011. As the vocational expert (VE) did not appear at that hearing, a supplemental hearing was held on March 23, 2011. Plaintiff was represented by counsel at both hearings. (Tr. 29, 48).

Ms. Hines testified that she lived with her husband and three children, aged 19, 13 and 10. (Tr. 34-35). Her husband traveled for work a lot. (Tr. 45). Her 13 year old son suffered a brain injury in a fall in 2008. She testified that caring for him "takes up a lot of my time." (Tr. 44-45). Her mother, husband and other children also help to care for him. (Tr. 53-54).

Ms. Hines stopped working in February, 2008, because the owner of the company died. (Tr. 36-37). She did not have to work in 2008 and 2009 because she was the beneficiary of a trust. (Tr. 56).

Plaintiff had a car accident on November 13, 2009, which caused her to become disabled. A pickup truck backed into her pickup truck. (Tr. 37). She had neck and back problems. She also had neurological problems. (Tr. 40). She had neuropathy and circulatory problems in her legs. (Tr. 41-42).

She was taking Gabapentin (i.e, Neurontin), which caused side effects of fatigue, moodiness, feeling "shaky" and difficulty in following directions. (Tr. 45-46).

Dr. Bordieri testified as a vocational expert. Plaintiff had no objections to his qualifications. (Tr. 23).

The ALJ asked the vocational expert (VE) to assume a person who could do light work, but who needed to be able to change position every hour, limited to no ladders, ropes or scaffolds and only occasional postural activities. Further, the person should avoid dangerous unprotected heights, concentrated exposure to pulmonary irritants, prolonged exposure to extreme temperatures, and was limited to simple, routine tasks. (Tr. 59). The VE testified that this person could not do plaintiff's past work, but could do jobs such as mail clerk and small products assembler. (Tr. 59-60).

**3.      Medical Records**

On November 13, 2009, plaintiff went to her family doctor, Dr. Zimmerman, complaining that she was in an auto accident that morning. She was alert and oriented, and was able to ambulate and get on and off the examining table without difficulty. Dr. Zimmerman detected mildly tender musculature of the low back with pain on extension. He prescribed a nonsteroidal anti-inflammatory drug, and gave plaintiff a back exercise sheet. (Tr. 295).

On that same day, Ms. Hines saw a chiropractor for complaints of pain in her neck and low back. She was treated by the chiropractor through February 11, 2010. (Tr. 303-348).

The chiropractor referred Ms. Hines to an orthopedic specialist, Dr. Gornet. She first saw him on December 16, 2009. She complained of neck pain, headaches, pain into both shoulders

and into her left arm. She also complained of pain in her low back, both buttocks, hips and knees. She said she had numbness in her left hand and in both feet. On exam, she had decreased range of motion of the neck. She was able to bend and forward flex. Straight leg raising produced pain on both sides. She had pre-existing scoliosis. (Tr. 602-603).

Dr. Gornet ordered a cervical MRI, which was done on February 8, 2010. This study showed diffuse posterior disc bulges at C4-5, C5-6 and C6-7. There was bilateral foraminal stenosis at those levels, but no central canal stenosis. There was a mild degree of ventral cord flattening at C4-5. (Tr. 288). Dr. Gornet felt that this disc pathology would account for her neck pain, headaches and arm symptoms. He noted that she complained of intermittent confusion, which he felt might be related to headaches, but he felt this should be evaluated by a neurologist. (Tr. 604).

On February 16, 2010, Dr. Zimmerman noted that she had some neck tenderness and mild tenderness in the low back. She had an excellent memory for the events of the accident, but seemed anxious. (Tr. 293).

Ms. Hines first saw a neurologist, Dr. Syed Ali, on March 9, 2010. She told him that she had been in an accident in November, 2009. She complained of feeling confused, with pain in her neck and low back and weakness in her legs. She said her toes were purple. She also complained of headache and feeling disoriented. On exam, Dr. Ali noted that her gait was hesitant and cautious. She had "collapsing weakness" of all extremities, but her muscle tone was normal and she had no atrophy. He spine was tender all over, with decreased range of motion. On neurologic exam, she was oriented. She had trouble with short term memory recall and decreased concentration. Her cranial nerve function was normal. Sensory function was "difficult to assess" and no assessment was recorded. His impression was post-traumatic syndrome, cervical, thoracic and lumbar strain with radiculopathy and scoliosis. He ordered testing. (Tr. 489-492).

Seven days later, Ms. Hines was seen by Dr. Anwar Khan, a physiatrist, on a referral from her primary care physician.[2] Dr. Khan wrote a lengthy letter to plaintiff's primary care physician regarding that visit. On exam, Dr. Khan noted that plaintiff had a normal gait pattern and was able to walk on heels and toes. Sensation to touch and pin prick (i.e., sensory examination) was normal in the upper and lower extremities. Muscle strength was good. There was no paraspinal muscle tightness in the spinal area. Patrick's sign and Lasegue' test were negative.[3] Range of motion of the head and neck was normal except that rotation was about 45 degrees bilaterally. Range of motion of the lumbar spine was normal except that flexion was 55-60 degrees and left side bending was 25 degrees. Dr. Khan's impression was that she complained of pain in the neck and back with radiation, and she complained of dizziness and memory impairment "by history etiology undetermined." He recommended that she continue to follow up with Dr. Ali as he had scheduled several tests. (Tr 514-516).

On Dr. Ali's orders, an MRI of the brain was done on March 22, 2010. This was normal. (Tr. 554). On the same date, a nerve conduction study was consistent with bilateral carpal tunnel syndrome and left lumbar radiculopathy. (Tr. 555-557).

Dr. Ali saw plaintiff on April 15, 2012. She complained of increasing back pain. She also complained of feeling distressed, anxious and tense. He noted the results of the testing that had been done. On exam, she had tenderness of her whole spine with an unspecified decrease in her range of motion. She again had collapsing weakness of all extremities. With regard to her

---

[2] A physiatrist is a "physician who specializes in physical medicine and rehabilitation. Physiatrists specialize in restoring optimal function to people with injuries to the muscles, bones, tissues, or nervous system, such as stroke victims." See, http://www.medterms.com/script/main/art.asp?articlekey=4890, accessed on September 13, 2012.

[3] A positive result on Lasegue's test is indication of lumbar root or sciatic nerve irritation. See, http://medical-dictionary.thefreedictionary.com/Lasegue's+sign, accessed on September 13, 2012.

sensory exam, Dr. Ali wrote "cannot assess." Deep tendon reflexes were 2+. Her cerebellar function was fair to normal. He again assessed post-traumatic syndrome and cervical, thoracic and lumbar strain with radiculopathy. Dr. Ali ordered an MRI of the spine and prescribed Lexapro. (Tr. 487-488).

An MRI of the thoracic and lumbar spine was done on April 24, 2010. There was scoliosis in the thoracic spine, with normal vertebral body heights. There was a bulging disc at C6-C7 with mild central canal stenosis, and small left central extrusions at three thoracic levels. The lumbar spine also had scoliosis, with mild disc height loss at L4-5. There were bulging discs at L1-2 and L2-3 and L5-S1 with no neural canal stenosis and no central canal stenosis. The disc at L4-L5 was bulging with an annular tear and mild foraminal and central canal stenosis. The radiologist described these findings as "mild degenerative changes." The study also showed a nodule in the right lung, suspicious for cancer. (Tr. 423-424).

Dr. Ali saw plaintiff again in May, 2010, and noted that she had been diagnosed with lung cancer. On exam, she had tenderness in her spine which he described as "not focal." She again had collapsing weakness of her extremities and he was again unable to assess her sensory status. She was depressed. He counseled her that the first priority was treatment of her cancer. (Tr. 485-486).

Ms. Hines had successful surgery to remove the lung cancer in June, 2010. (Tr. 382, 550-551). In a preoperative examination in May, 2010, a doctor at Washington University School of Medicine in St. Louis, Missouri, found that she had no focal neurological deficits. (Tr. 384).

Plaintiff returned to Dr. Ali on October 26, 2010. He noted that she had not had any radiation or chemotherapy following her cancer surgery. He again noted nonfocal tenderness of the entire spine with muscle spasms. She had collapsing weakness of all extremities, and her sensory status was "difficult to assess." (Tr. 483-484).

On December 6, 2010, Dr. Ali's exam was much the same, except that she had numbness in her feet bilaterally. He suspected peripheral neuropathy and ordered a Doppler study and MRI of the spine. (Tr. 481-482).

The Doppler study done on December 20, 2010, showed no significant arterial occlusive disease. (Tr. 558). The MRI done on the same date showed no evidence of metastatic disease and mild degenerative changes of the spine, unchanged from the previous study done in April, 2010. (Tr. 559-560).

Plaintiff saw Dr. Ali for the last time on January 4, 2011. She complained that her feet and legs were cold and tired, and she could not wear shoes because her toes were swollen. He noted that the neuropathy screen and Doppler study were negative and the MRI showed multiple bulging discs. On sensory exam, she had dysesthesia all over. Dr. Ali prescribed Neurontin. (Tr. 479-480).

**4.     RFC Evaluations**

Dr. Ali assessed plaintiff's RFC by completing a form on January 10, 2011. He opined that she could lift less than 10 pounds, stand/walk for a total of less than 2 hours a day, sit for a total of less than 2 hours a day, and was limited in her ability to push and/or pull with her lower extremities. He opined that she could do postural activities such as balancing and stooping only occasionally, and was limited in ability to reach in all directions. She should avoid even moderate exposure to humidity and concentrated exposure to other environmental hazards. (Tr. 511-512).

A state agency physician evaluated plaintiff's RFC in May, 2012, and concluded she could do work at the light exertional level, limited to only occasional postural activities. (Tr. 368–375).

**Analysis**

Plaintiff argues that the ALJ erred in not giving controlling weight to the opinions

expressed by Dr. Ali in his report of January 10, 2011.  She is incorrect.

First, to the extent that Dr. Ali was opining as to plaintiff's RFC, such opinions are *not* entitled to any special weight because the issue of RFC is an issue that is reserved to the Commissioner.  See, 20 C.F.R. §404.1527(e).  SSR 96-59 explains:

> However, treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance. Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.

SSR 96-5p, at *2.  See also, **Denton v. Astrue, 596 F.3d 419, 424 (7th Cir. 2010)**.

Dr. Ali's medical opinion, as opposed to his opinion as to RFC, is, of course, not automatically entitled to controlling weight.  Rather, it is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record.  **Clifford v. Apfel, 227 F.3d 863 (7th Cir. 2000); Zurawski v. Halter, 245 F.3d 881 (7th Cir. 2001).**

With regard to the assessment of treating source opinions, **20 C.F.R. §404.1527(d)(2)** states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [emphasis added]

As the Seventh Circuit recently stated, "An ALJ can give less weight to a doctor's opinion if it is internally inconsistent or inconsistent with the other substantial evidence in the record as long as she articulates her reasons for giving the opinion less weight, 20 C.F.R. §

404.1527(c)(3), (4); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004)." **Hall ex rel. Hall v. Astrue, 2012 WL 2948173, *2 (7th Cir. 2012).** The ALJ is required only to "minimally articulate" his reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax." *Berger v. Astrue***, 516 F.3d 539, 545 (7th Cir. 2008)**; *Elder v. Astrue***, 529 F.3d 408, 415 (7th Cir. 2008)**.

Plaintiff admits in her brief that the ALJ articulated his reasons for discounting Dr. Ali's opinion, and that those reasons were "set forth in some detail and in some length." Doc. 21, p. 19. Thus, this is not a case where the ALJ ignored evidence that favored the claimant or failed to give his reasons for discounting a doctor's opinion. Rather, plaintiff here argues that the reasons given by the ALJ are not sound or well-supported by the record.

On the contrary, the ALJ's reasons for discounting Dr. Ali's opinion are supported by substantial evidence and are proper considerations under §404.1527(d). ALJ Hanekamp said that Dr. Ali's progress notes were inconsistent with "a wealth of documentation" from other sources, and his opinion was not well supported by objective laboratory diagnostic techniques and clinical signs. See, Tr. 21. He noted the discrepancies between Dr. Ali's findings and those of Dr. Khan, even though the two doctors saw plaintiff at about the same time. He noted that Dr. Ali recorded that it was difficult to assess plaintiff's sensory examination while other doctors had no such difficulty. (Plaintiff's argument misses the mark with regard to his point; she argues that the ALJ did not explain why Dr. Ali's remark "means this portion of Plaintiff's neurologic exams is to be disregarded." Doc. 21, p. 25. This argument ignores the fact that Dr. Ali recorded that sensory exam was difficult to assess or that he was unable to assess sensory status on most visits. See, Tr. 484, 486, 488, 492. On those visits, he did not make any assessment of her sensory status. Thus, there was nothing for the ALJ to "disregard.") He noted that Dr. Ali said that plaintiff had

decreased range of motion, but never gave any specific measurements.  This was in contrast to the specific measurements recorded by Dr. Khan, who measured only mild restrictions.  He noted that the results of objective testing were not consistent with disabling injuries.  MRI and EEG studies of the brain were normal, as was Doppler study of the lower extremities.  The MRI studies of plaintiff's spine showed only mild degenerative changes with no evidence of disc herniation causing nerve root impingement or central canal stenosis.  The ALJ noted that NCS/EMG testing was consistent with carpal tunnel syndrome and left lumbar radiculopathy.  However, he also noted that no doctor every recommended any treatment for carpal tunnel syndrome, which suggests that the condition was mild.  He further noted that the finding of left lumbar radiculopathy was inconsistent with the MRI findings of no disc herniation and no nerve root impingement.  Further, he noted that Dr. Ali never suggested that she be evaluated for spinal surgery.  See, Tr. 18-20.

The ALJ discussed the reasons for the weight he assigned to the medical opinions in great detail, supporting his rationale with references to specific evidence in the record.  His decision easily meets and exceeds the requirement that he minimally articulate his reasons for discounting Dr. Ali's opinion.  The reasons he gave were proper considerations.  See,  **Filus v. Astrue, ___ F.3d ___, 2012 WL 3990651, *4 (7th Cir. 2012); Elder v. Astrue, 529 F.3d 408, 415 (7th Cir. 2008)**.  The ALJ's decision therefore was supported by substantial evidence and was not the product of legal error.

In the final analysis, plaintiff's argument is an invitation to this Court to reweigh the medical evidence.  However, it is the function of the ALJ to weigh the evidence.  Crucially, the reviewing Court is "not free to replace the ALJ's estimate of the medical evidence with [its] own."  **Berger, 516 F.3d at 544.**  The ALJ's decision must be affirmed if it is supported by substantial evidence and, in reviewing for substantial evidence, this Court cannot reweigh the

evidence or substitute its own judgment for that of the ALJ. *Ketelboeter v. Astrue*, **550 F.3d 620, 624 (7th Cir. 2008)**.

### Recommendation

After careful consideration, this Court is convinced that the decision of the ALJ is supported by substantial evidence in the record as a whole, and that no errors of law were made. Therefore, the final decision of the Commissioner of Social Security, denying plaintiff Kimberlee K. Hines' application for social security benefits, is **AFFIRMED.**

The Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

DATE:  September 14, 2012.

                                        s/ Clifford J. Proud
                                        **CLIFFORD J. PROUD**
                                        **UNITED STATES MAGISTRATE JUDGE**